I'd like to first address the issue regarding the expert testimony. Timing is everything, in life, in law, and in trial. That's why the government saved its questions of Ms. Milligan, asking her whether her expert opinion, in effect, was correct. Mr. Merriam was guilty of manipulating stock because he issued stock while the manipulation by Mr. Shepard was ongoing. We would have to find that's the effect, wouldn't we not? Because that wasn't exactly the question. It was more generally couched, wasn't it? Well, it was somewhat obliquely couched in the sense that the hypothetical was posed, if the issuer continues to issue while the manipulation is ongoing, is it more likely that that person is involved? And the answer was yes. But the net effect of the question, since there was only one issuer and no one disputed that, was that they were talking of Mr. Merriam. And so the opinion could not have been more direct if she substituted Mr. Merriam for the word issuer because everybody in the courtroom knew who she was referring to. The contrast between this and the kinds of opinions that the court has approved is rather glaring. In this case, credibility was the main issue. There were no smoking guns here. There was no physical evidence. There was no confession. Credibility of the witnesses. On the government side, we had two admitted liars. And on the defense side, we had Mr. Merriam. So in the cases where the court has approved expert opinion that relates to facts indicative of guilt, for example, the Gomez-Norena case cited by the government at 908 F. 2nd 497, what the agent testified to was that possession of $200,000 worth of drugs is consistent with possession for sale. Well, not only is that sort of common sense, but what's different is that he said consistent. He didn't say, in your opinion, is the defendant guilty of possession for sale because he was in close proximity to or possessed $200,000 worth of drugs. And the difference is significant because on the one hand, consistent with allows the jury to reach its own conclusion. Consistent with could be inconsistent with. It's not exclusive. Here, what the opinion did is it drew the nexus. It made the conclusion. It stated that if a person issues stock while someone else is manipulating it, while the manipulation is ongoing, that person is more probably guilty. There could be no doubt that the expert opinion left nothing for the jury to decide. I mean, the jury obviously could reject the expert opinion as there were instructions to that effect. But it ran afoul of well-established federal law that prohibits expert opinions on the issue of guilt for the simple reason, not that they're inaccurate, not that they're wrong, but the jury gives them too much weight because a person who's qualified with this great experience gets up there and says the defendant is guilty. A jury composed of lay persons is quite likely to conclude that expert must be right because he's an expert. Of course, that is what he said, wasn't it? Well, I can read directly. I can read directly what was said there, Your Honor. If I can find the page here. So in your experience, this is by Ms. Cain, is there, the prosecutor, is there any correlation between the fact of an issuance being involved in a pump and dump scheme and the issuance involvement in that scheme? Yes. Can you explain? Yes. Because to the extent that there is an issuance of securities, the issuer would be involved in the drafting, offering circulars, prospectuses, registration statements pertaining to the issuance of securities, and it would be the issuer who would have the authority to allow the transfer agent to release the certificates. Question. So just to make sure I understand the conclusion, is it more or less likely in your experience that an issuer is involved in a pump and dump scheme when there is an issuance ongoing? There's an objection, speculation, lack of foundation. The court allows the question. I would say in my experience it's more likely. So more likely is not the same as saying guilty? Of course not. But on the other hand, the prohibited opinion is not one of degree. It's not saying that I have to say beyond a reasonable doubt that this person is issuing, is guilty of it. What he's given is it's his opinion that's more likely. And jurors don't expect the opinions to be couched in legal terms of conclusions that they have to draw. So I know what any U.S. attorney worth their salt try to do that because it's a red flag to the judge that, you know, experts saying beyond a reasonable doubt it's true. So you're saying that if in fact it's true that where issuers, because they are necessarily involved in reviewing the materials and are part and parcel of the offerings and the like, that that is in fact his experience, that more often than not, the issuer had knowledge, therefore intended to be involved? You say that that's a prohibited opinion because it goes to mens rea, basically. Absolutely, because what he's saying is that not that this person, not based upon my review of the facts, you know, and this, this and this, but as a general matter, people who issue stock while someone else is manipulating are involved. It's profile evidence. And it's like, you know, people driving in cars, you know, having taillights out and license plates that are covered with mud and, you know, all those things that we see in all those drug cases or that you see in all those drug cases that come before the court where there's the profile evidence. It's the same thing here. They're asking the jury to draw a guilty inference from an innocent fact, fact innocent in and of itself based upon an expert opinion. Can I address that? Maybe you're about to shift. Could you address the cross-examination issue? Absolutely. One would think that it's elementary that impeachment can only be done by material that's likely to impeach, that has impeachment value. If a person is told that their house is worth $400,000 by a certified appraiser, one would think that you can't impeach that person's credibility if that person repeats that representation to a buyer because this is what he was told. Same thing here. We had a prospectus issued that listed the means of valuation. There's undisputed evidence that there were three different accounting firms that went through the process as to how these evaluations were arrived at. And so that to impeach Mr. Miriam with information that he was provided by recognized experts who said this is the way you do it, it doesn't impeach his credibility. It was designed for one purpose and one purpose only, because the jury was likely to misunderstand the evidence and the jury was likely to hold it against him as bad character evidence that he's the person who is likely to lie because he makes these representations which- What exactly was the question? I haven't been able to find the actual transcript of the questions. They have the how it's characterized. It goes over a series of four pages where they ask it. And isn't it so that this company had never made a profit and yet you valued it as so much money? It's in the excerpt of the record, which unfortunately I don't have in front of me. But I would like to reserve my remaining time if I could for rebuttal, Your Honor. Sure. May it please the Court. Good morning. My name is Lori Kloster Gray. I represent the United States. With regard to the first issue, the district court did not abuse its discretion in permitting Ms. Milligan to give her opinion testimony. At the outset, I think it's important to note and clarify the record that her opinion was not based on a single factor and it was not profile evidence. As a matter of fact, it was based on a collection of factors. Starting in direct examination, the prosecutor had posed the questions to her by saying, and this is at TAN reporter's transcript, page 1087. In your experience, what are the classic indicators that stock prices rise based on a manipulative scheme as opposed to a natural market flow? She responds, I can describe to you the things that we look for in market manipulation, and then goes through and lists five factors. First, we would look for a particular firm, a market maker that would be very active in the stock. Second, we would look for the issuance of securities, because oftentimes what we found is that there's an issuance of securities and there's a price rise that occurs shortly after that. And again, sometimes those two things, not always, but sometimes they're linked. That's what she says with regard to the issuance. Third, we would look for a rash of customer complaints. Fourth, we would look for any information that might have been put out by either a broker-dealer or a company that might be considered false or misleading information. Fifth, customer sellouts, meaning that customers are sold out of their accounts because they never paid for the stock. Those are some examples. Further on in that direct examination, the prosecutor asks. Stay in front of the mic, would you, please. Sorry. Thank you. Further on in that direct examination, the prosecutor asks, and this is that TAN reporter's transcript at 1094, more general questions about the issuer. And in your experience, when an issuer or a firm, referring to the company that's listed, is actually involved in the manipulation, what would their role be typically? She responds, we see issuers involved in terms of paying market makers to actually get involved in a stock. We see issuers involved in terms of inflating financial statements or putting out information on the financial statement that's not accurate. And we see issuers involved in terms of issuing stock to people who then manipulate the price and sell the stock out at a higher price. On cross-examination, defendant then relying on Ms. Milligan's expertise, asked what factors would indicate that an issuer was not involved in a pump-and-dump scheme. In response to that, in redirect examination are the three questions to which defendant objects. The question was posed in redirect at 11, reporter's transcript 1220. In your experience, when the pump-and-dump scheme involves an issuance of stock, is it more or less likely that the issuer, him or herself, is involved in the scheme? The question is put forth generically. It's nameless. It's genderless. That is the question. It's objected to. Sustained, let's lay a little broader foundation. Yesterday we talked about the different people that might be involved in a pump-and-dump scheme. Do you recall that? Yes. And you told us some of the indicators of an issuer being involved in a pump-and-dump scheme. And that's the whole list that I've just read to the court. The question then, as read by counsel here, is in your experience, is there any correlation between the fact of an issuance being involved in a pump-and-dump scheme and the issuer's involvement? Yes, she explains, and says in her experience, it's more likely. Your Honors, that is precisely the type of evidence permitted under Rule 704 and is virtually identical to the facts in United States v. Gonzales, a case decided in September by this Court. And I know Judge Hugg is familiar with it, having been on the panel. While that was a drug case, the question posed in that particular case to the agent was whether he was asked whether the particular amount of drugs found on a person indicated that that individual possessed the drugs for personal use or distribution, further asked whether his opinion would be firmer or less firm if the person carrying the drugs was also carrying a gun, a payo sheet, and scales. This Court held that that was proper 704 questioning and opinion testimony because the agent never directly and unequivocally testified to defendant's mental state, never directly and unequivocally testified that Gonzales had the intent to distribute, rather simply said it was his opinion that a person possessing that evidence would in fact possess the drugs for purpose of distribution. That same result should hold here. Could you address the, unless there are more questions on that, could you address the cross-examination? Certainly, Your Honor. Suggestion of being sandbagged by him? The defendant was definitely not sandbagged. The government indicated that it would not introduce portfolio evaluation evidence in its case in chief, but made it plain that the defendant would open the door if he described Vintage as a thriving company or a risk-free investment. And that was discussed prior to the defendant taking the stand so that the parameters of the cross-examination were very clear. Indeed, the defendant did open the door. The defendant did describe Vintage as a thriving company, and as the district court found in its written order that's been excerpted at the government's excerpts of record, the portfolio over-evaluation was material to defendant's intent to deceive. And viewing the questions that were asked in context, first of all, the defendant indicated that the press release contained figures of the portfolio companies. He put that out touting Vintage's financial health. That was one basis for the court's decision. Well, the press releases, at least the copy I have, maybe there's more to it, is this the one that has the columns of numbers for April 30, 1990 and the year before? That's correct. And the source of the numbers that are shown was what? The source of the numbers came from the defendant had put them on from the companies. And if I can just go through some of the cross-examination. I'd just like to know what's the foundation for this. What is it about this press release that opened the door? What opened the door is on May 2 when the stock of Vintage went down substantially based on the New York Times article.  Right. But there was some there there to Vintage. And the figures that were contained in what, the 1990 column, were what, supposedly fake or what? Those figures, Your Honor, didn't actually – it made it appear that the companies were healthy when, in fact, as Mr. Merriam knew, they weren't. And if I can – Well, but are these numbers that are here, are they improper numbers? Isn't the argument that these were numbers that had been certified by accounting firms? Those particular numbers on the press release? Yeah. In other words, if these are true numbers, what's wrong with putting that press release out? Because he left certain things out. And that's made apparent in his cross-examination when he's asked about that press release. The question is posed to him, so I guess you weren't surprised on May 2 when the stock fell because you knew it was going to fall. That's right. That ties into his testimony, as the district court found, that he had said that he thought the stock was artificially high. He's asked, well, did you do anything to try to get it back up again? Oh, yes. You put out a press release, right? Correct. On May 14. And in the press release, you stated you put out information about your revenues and how Vintage was doing. Correct. And that press release included in it, included Vintage's value based on the aggregation of these portfolio companies. That's what the press release included. Correct. In fact, it showed a significant increase from 1989 to 1990. Correct. And that's what you're referring to, Your Honor. But here's where we get to find out that those numbers aren't exactly right. The question is posed, and that included unrealized gain from the interest that Vintage held in each of those portfolio companies. Right? That's correct. So based on the fact that you were telling. . . And those were signed off on by accounting companies? Sort of the Arthur Anderson type of accounting? That I don't know, Your Honor. I do not know off the top of my head. You were saying the portfolio companies were worth more. That meant that Vintage was worth more. That's correct. But that gain was unrealized. It wasn't like Vintage had actually gotten money from the portfolio companies between 1989 and 1990. That's correct. Vintage didn't get money because the defendant had improperly diverted the regulation. So if this would have been a financial statement, there would have been an asterisk saying, explaining that these revenues including unrealized. . . Correct, Your Honor. There was nothing explaining that. And so as a result, again, he used those figures. It was part and parcel of the deception. But these were signed off on? These numbers were certified numbers by an accounting firm? The numbers in the press release? Well, I mean, they're drawn from a 10-Q. I'm not sure. Are these drawn from the 10-Q? The 10-Q actually reported negative net worth, reported negative figures, and that was the cross-examination that it made very clear that there were negative figures. Now, the defendant went to great lengths in the redirect examination to go through why he believed he went into the methodology, why these were correct, why these numbers were akin to Amazon, who despite, you know, reporting a negative net worth makes billions in sales. And he went through all that. The government abided by the district court's ruling, which was that nothing with regard to methodology was to be presented. So it was five pages of questioning out of 167 pages of the cross-examination. And to the extent the court finds that there was any error in that cross-examination, and I'm certainly not conceding that, but to the extent that the court believes that there was something wrong, this is an abuse of discretion standard. And I would argue that looking at the harmless air here, the evidence of guilt was overwhelming in this case, that the defendant repeatedly and consistently violated all of the provisions of the Offering Circular. He held checks in violation of the Offering Circular and actually shot himself in the foot with regard to that at trial because his statement had always been, no, no, I didn't hold checks. He had made that statement, Your Honor, to the certified public accountants. He had made it under oath to the SEC investigators. He had told that to prosecutors. And suddenly at trial his newly minted explanation was, well, wait a minute, you know, I did hold them because I thought this was a best efforts solicitation and that's the way I was doing it. Okay. Your time is up. Thank you. Your Honor, I wish I could give an affirmative answer as to the court's question as to where those figures came from. I don't have it off the top of my head. But my understanding was that the figures that were used as to the evaluations of the companies were in the prospectus that was issued at the time the company, the Reggie offering was made public. And there, as to each figure, as to each company, it explained where the method of evaluation and where it came from. What the government has deftly dodged is the fact that there is no indication that these figures are false. There is nothing about any of these figures that indicates that Mr. Merriam made them up with intent to deceive anyone. The only evidence in the record is that accounting firms advised them as to how to get these figures together, how to evaluate companies, and based on that evaluation, those figures were arrived at with explanations to the public as to how they were there. Now, the government ended with a peon to its evidence that Mr. Merriam was guilty. Well, even people that the government thinks are guilty are entitled to be tried in accordance with the federal rules of evidence and not be properly impeached. Here we had the government certainly hasn't gotten up here and said that Mr. Shepard was a paragon of truth-telling. He admitted that he lied and was struck by this transcript with a certain disdain for the consequences of his testimony. He didn't care. He just didn't care what the stock people thought about him. He just didn't cooperate. We also had the other, Ms. LaLoche, who also admitted committing perjury on more than one occasion. So we have those people arrayed against Mr. Merriam, and this is hardly a slam-dunk for the government. These are things, this is a credibility case. This is a close case. This is a case where the words of each witness were carefully weighed by the jury, and the government's use of this evidence was especially egregious because the government knew that there was expert opinion, and it was put in part of the motion for new trial that said these figures were correctly arrived at. The government knew that when it did that, and yet what they did is they made fun of Mr. Merriam and impeached his credibility in a manner that no jury could understand. I barely understand these accounting principles, no less a juror who just, you know, has no background in this is called to serve on a jury. What we have here are two areas that potentiated each other. We had an expert witness give its expert opinion that Mr. Merriam was guilty, granted not in those words, but that was the import of his testimony, and we had impeachment with evidence suggesting that Mr. Merriam was lying. When the government knew full well that those figures were not Mr. Merriam's lies, but they were drawn from accounting principles. So are you familiar with the term of generally accepted accounting principles? Yes. Is your representation that these were gap numbers? You know, I'm familiar with the term. Do I understand generally accounting principles? No. Does it appear from the record that they were? Yes. Could I certify in my own personal knowledge that this is the way to do it? Absolutely not. That's why I hired an accountant. All right. Thank you very much, Your Honor. Thank you. All right. The case is argued to be submitted. Thank you.
judges: Hug, Gibson, Fisher